# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

ANGELA S. STEWART,          )
         )
      Plaintiff,          )
         )
    vs.          )     **Case number 4:09cv0552 TCM**
         )
MICHAEL J. ASTRUE,          )
Commissioner of Social Security,          )
         )
      Defendant.          )

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying Angela S. Stewart's application for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b, is before the Court, see 28 U.S.C. § 636(c), for a final disposition. Ms. Stewart has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Angela Stewart (Plaintiff) applied, for the fifth time, for SSI in March 2000, alleging a disability since November 1998 due to epilepsy, fibromyalgia, Paget's disease,[1] scoliosis,

---

[1]Paget's disease is "a generalized skeletal disease, frequently familial, of older persons in which bone resorption and formation are both increased, leading to thickening and softening of bones . . . and bending of weight-bearing bones . . . ." Stedman's Medical Dictionary, 501 (26th ed. 1995) (Stedman's).

degenerative disc disease, arthralgias,[2] and asthma. (R.[3]46-47.) Her application was denied after a hearing before an Administrative Law Judge (ALJ). See Stewart v. Barnhart, Case No. 4:02cv1516 DJS/AGF, Docket #20 at 2 (E.D. Mo. Dec. 22, 2003). The denial was affirmed by the court. Id. Docket # 22 (E.D. Mo. Jan. 6, 2004).

Plaintiff applied for SSI again in March 2006, alleging a disability beginning December 18, 1998, caused by the same impairments. (Id. at 134-36.) This application was denied initially and after a hearing in October 2008 before ALJ Victor L. Horton. (Id. at 5-44, 81-99.) The Appeals Council denied her request for review, effectively adopting the decision of the ALJ as the final decision of the Commissioner. (Id. at 1-3.) Plaintiff's request for judicial review of that decision is now pending.

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, and John McGowan, a vocational expert (VE), testified.

Plaintiff testified that she was then 39 years old. (Id. at 9.) She is married and lives with her husband and three children, ages eighteen months, three years, and nine years. (Id. at 9-10.) She has a General Equivalency Degree (GED). (Id. at 10.) She is right-handed, 5 feet 2 inches tall, and weighs 270 pounds. (Id.) She does not have any problems reading

---

[2]Arthralgia is "[s]evere pain in a joint, especially one not inflammatory in character." Stedman's at 149.

[3]References to "R." are to the administrative record filed by the Commissioner with his answer.

newspapers or magazines and can do simple arithmetic. (<u>Id.</u>) She has difficulty writing because of muscle spasms in her hand. (<u>Id.</u> at 10-11.)

Plaintiff also has problems handling buttons, zippers, coins, and other similar items. (<u>Id.</u> at 34.) When she wakes up in the morning, her thumb, first finger, and middle finger on each hand are numb. (<u>Id.</u> at 35.) She has difficulties with larger objects such as eating utensils. (<u>Id.</u>) It is worse, however, when using her right hand. (<u>Id.</u>) It is hard for her to reach overhead. (<u>Id.</u>) Numbness in her feet causes balancing problems. (<u>Id.</u> at 36.)

The household income consists of her husband's wages and child support. (<u>Id.</u> at 11.)

Plaintiff last worked in October 1998 calling doctors about medical surveys. (<u>Id.</u> at 11-12.) She did this job for about three months. (<u>Id.</u> at 12.) Before that, she had a job cleaning medical offices for approximately one month. (<u>Id.</u> at 13.) She dusted tables, vacuumed the carpet, and cleaned the restrooms. (<u>Id.</u>) She did this job four hours a day, five days a week. (<u>Id.</u>) When working at this job, she also worked as a cashier for Walgreen's. (<u>Id.</u> at 14-15.) Before these jobs, she had another cleaning job for approximately four months. (<u>Id.</u> at 14.) She worked at this job for eight hours a day, five days a week. (<u>Id.</u>) She had worked full-time as a cashier for Walgreen's in 1987 or 1989. (<u>Id.</u> at 16, 18.) With the exception of the cashier jobs, all the jobs she has done in the past fourteen years were either cleaning or telephone work. (<u>Id.</u> at 14.)

Her doctor, Dr. Vargas, has recommended she stay home and do as little as possible. (<u>Id.</u> at 18.) He also recommended that she apply for SSI. (<u>Id.</u>)

Asked to explain how her medical conditions prevent her from working, Plaintiff replied that her primary problem is dystonia,[4] a form of Parkinson's, which is incurable and affects every part of her body. (Id. at 19.) She constantly has muscle spasms and tremors. (Id.) She intermittently has twitches in her intestines, feet, hands, face, and eyelids. (Id.) Stress affects it. (Id.) She takes Neurontin three times a day to control the dystonia. (Id.) The dystonia was diagnosed by eliminating other possible causes. (Id. at 19-20.) The dystonia also affects her voice. (Id. at 23.) Because of the dystonia, she has a tremor in both hands, arms, and legs and has diarrhea problems. (Id. at 33.)

Plaintiff also has epilepsy, and has been having grand mal seizures for the past thirty-eight years. (Id. at 20.) She takes Tegretol. (Id.) Her epilepsy is intermittently controlled, but is currently uncontrolled. (Id.) Because of her epilepsy, she has not been able to obtain a driver's license. (Id.) Her diabetes is also currently not controlled and has resulted in diabetic neuropathy. (Id.) Neurontin is supposed to help this also. (Id.) Her doctor has told her it will get worse. (Id.) She has a daily shot of insulin. (Id. at 20-21.)

Additionally, Plaintiff has asthma, for which she uses inhalers. (Id. at 21.) Still, she has to stay away from pets, air fresheners, and other triggers. (Id.) She can control the asthma when she is in her own environment. (Id.) She has bone spurs in four places in her neck, degenerative disc disease, a form of Paget's disease, and scoliosis. (Id.) These

---

[4]Dystonia is "[s]ustained abnormal postures and disruptions of ongoing movement resulting from alterations in muscle tone." Merck Manual of Diagnosis and Therapy, 1494 (16th ed. 1992).

impairments affect her walking standing, sitting, and arms.  (<u>Id.</u> at 22.)  She refuses to take pain pills.  (<u>Id.</u> at 22, 34.)  Over-the-counter medication does not help.  (<u>Id.</u> at 34.)

She has a new, heart problem.  (<u>Id.</u> at 22.)  Specifically, she has blockage and chest spasms.  (<u>Id.</u>)  She has osteoarthritis.  (<u>Id.</u> at 34.)  Plus, her psoriasis causes her skin to itch and bleed.  (<u>Id.</u> at 24.)

On a scale from one to ten, with ten being the highest, her pain is a ten "or higher" about 98% of the time.  (<u>Id.</u> at 34.)

Doctors have told her to lose weight, and she has tried.  (<u>Id.</u> at 24.)  Her limited mobility, caused by the dystonia, has made it hard for her to do so.  (<u>Id.</u>)  She smokes four cigarettes a day, and used to smoke half a pack.  (<u>Id.</u> at 26.)  She does not drink alcohol or use illegal drugs.  (<u>Id.</u> at 26-27.)

Plaintiff can walk at most half a block.  (<u>Id.</u> at 25.)  Sometimes she can resume walking after resting; sometimes she cannot.  (<u>Id.</u>)  She can stand for three to five minutes.  (<u>Id.</u>)  The longest she can sit is thirty minutes.  (<u>Id.</u>)  Sometimes she can resume sitting after changing positions, sometimes she cannot.  (<u>Id.</u>)  Problems with her ankles cause her to fall.  (<u>Id.</u> at 36.)  The frequency varies, but she falls an average of every other day.  (<u>Id.</u>)

Asked about side effects from her medications, Plaintiff replied that they cause stomach problems, fatigue, pancreatitis, and an ulcer.  (<u>Id.</u> at 26.)

Plaintiff does some housework.  (<u>Id.</u> at 27.)  She gets her children up in the morning.  (<u>Id.</u> at 28.)  She does not make them breakfast, unless it is pouring a bowl of cereal.  (<u>Id.</u>)  She makes sure her nine-year old has what he needs for school.  (<u>Id.</u>)  Her two younger

children watch educational programs on television.  (Id. at 30.)  She teaches her three-year old his colors and how to count. (Id.)  She watches her two younger children during the day and lays down when they do.  (Id. at 33.)  She puts the laundry in the washing machine but cannot take it out.  (Id. at 30.)  Her husband does this.  (Id.)  The meals she prepares are ones that can be microwaved.  (Id.)  She does not have any hobbies.  (Id. at 31.)  She does not do any vacuuming or the dishes.  (Id.)   She does not do any shopping.  (Id. at 32.)  The only time she leaves the house is to go to the doctor or to a teacher meeting.  (Id.)

Mr. McGowan testified as a VE.  He testified that Plaintiff's jobs in the past fifteen years were not substantial gainful activity.  (Id. at 39.)  Her cleaning jobs were light, unskilled jobs.  (Id.)  The ALJ then asked the VE the following:

> Assume a hypothetical individual with Claimant's education, training, work experience at the time of AOD [alleged onset of disability].  Further assume the individual can occasionally lift 20 pounds, frequently 10, stand and walk two hours out of eight, sit six hours out of eight, avoid concentrations of fumes, odors, dust and gas as well as extreme cold and wet.  Would this individual be able to perform any jobs?

(Id. at 39-40.)  The VE replied that such an individual would be limited to sedentary work and a clean environment.  (Id. at 40.)  Telephone soliciting jobs would qualify; 1400 such existed in the state economy and 110,000 existed in the national economy.  (Id.)  Although the Dictionary of Occupational Titles (DOT) listed such jobs as having an SVP of 3, a person could be trained to perform the work in the first week.[5]  (Id.)  Another unskilled job such

---

[5]SVP "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational Titles: Appendix C – Components of the Definition Trailer, 1991 WL 688702 (4th ed. Rev. 1991).  For instance, an SVP of two requires

person could perform would be a credit checker, 2200 of which existed in the state economy and 55,000 in the national economy, or an electronic assembler, of which 4,000 existed in the state economy and 355,000 in the national economy. (Id. at 41.)

Asked about jobs such an individual could perform if she had a maximum lifting ability of ten pounds and needed a sit/stand option, the VE replied that the positions of a cashier-checker might be available depending on the worksite. (Id. at 41-42.) The VE further replied that the job of security systems monitor might be available. (Id. at 42.) This job had a SVP of 2, unskilled.[6] (Id.) There were 2,000 such jobs in Missouri and 110,000 nationally. (Id.)

The VE was then asked a third hypothetical. (Id.) In addition to the previous limitations, this individual could only occasionally lift overhead, raise her arms overhead, and do fine and gross manipulation. (Id.) He replied that the occasional lifting overhead would not be a problem in sedentary work. (Id.) The majority of the sedentary jobs, however, required "a good use of both hands." (Id.) An additional limitation on fine manipulation would eliminate all work. (Id. at 42-43.)

---

"[a]nything beyond short demonstration up to and including one month." Id. An SVP of three requires over one month up to and including three months, id., and corresponds to semi-skilled work, Policy Interpretation Ruling: Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, SSR 00-4p, 2000 WL 1898704, *3 (S.S.A. Dec. 4, 2000). An SVP of two corresponds to unskilled work. Id.

[6]See note 5, supra.

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her application, records from various health care providers, and two assessments.

When applying for SSI, Plaintiff completed a Disability Report, listing her height as 5 feet 2 inches and her weight as 250 pounds. (Id. at 150-56.) She reported that she had seizures when awake, was unable to sit or stand for long periods, and could not lift anything heavier than ten pounds because of the threat of a hernia. (Id. at 151.) Her impairments first bothered on December 18, 1998, and prevented her from working that same day. (Id.) She had stopped working on November 5, 1998, because of complications with seizures. (Id.) She listed three jobs, one as cashier, one cleaning, and one as phone surveyor. (Id. at 152.) Her longest period of employment was from 1991 to 1993. (Id.) She was currently being treated by Ted C. Vargas, M.D. (Id. at 153-55.) She listed the same three jobs on a Work History Report. (Id. at 158-67.)

A Function Report was completed on Plaintiff's behalf by her live-in boyfriend of one year, eight months. (Id. at 168-76.) With his help, she takes care of the basic needs of his two children, one who is seven years old, one who is eight months old. (Id. at 169.) Her sleep is affected by the grand mal seizures she has during the night. (Id.) Her impairments did not affect her abilities to bathe, dress, or use the toilet. (Id.) Her diet was affected by her diabetes. (Id.) She did not shave as often as she used to. (Id.) He reminds her to take her medication. (Id. at 170.) For meals, she fixed sandwiches, warmed frozen meals, and did

box dinners.  (Id.)  She does household chores of cleaning fifteen minutes a day and laundry weekly.  (Id.)  Plaintiff rarely goes outside.  (Id. at 171.)  Because of her epilepsy, she cannot drive.  (Id.)  She shops once a month.  (Id.)  She watches television, talks over the telephone, and watches her children grow.  (Id. at 172.)  Her impairments affect her abilities to lift, sit, climb stairs, squat, kneel, bend, talk, stand, hear, use her hands, reach, and walk.  (Id.)  She can lift no more than ten pounds and can walk or stand for no longer than ten minutes.  (Id.)  She walks no farther than 200 feet before having to stop and rest for a few minutes.  (Id.)  She follows written instructions and gets along with authority figures fine.  (Id.)  She constantly has heartburn.  (Id. at 175.)  She has to have four injections a day to control her diabetes.  (Id.)

Plaintiff also completed a Function Report.  (Id. at 177-84.)  During her waking hours, she eats, sleeps, and takes medication.  (Id. at 177.)  She takes care of her children.  (Id. at 178.)  Before her impairments, she did everything a "normal person" did, including cooking, cleaning, washing and brushing her hair, and walking and standing for a long time.  (Id.)  Now, she can not button buttons, pull zippers, wash or brush her hair, or hold utensils for longer than a few minutes.  (Id.)  She has to be reminded to take her medication.  (Id. at 179.)  The meals she prepares are warmed frozen dinners.  (Id.)  This takes her two hours.  (Id.)  She can not lift pans, stir, or be near heat.  (Id.)  She vacuums and puts dirty laundry in the washing machine.  (Id.)  Her interests include listening to music.  (Id. at 181.)  She does not go anywhere or socialize with anyone.  (Id. at 182.)  She can lift only ten pounds.  (Id.)  Problems with her ankles and knees keep her from squatting.  (Id.)  Back problems keep her

from bending.  (Id.)  She can walk no farther than one-half block without having to rest five minutes.  (Id.)  Her impairments affect her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hearing, climb stairs, complete tasks, and use her hands.  (Id.)  She follows written and spoken instructions and gets along well with authority figures.  (Id. at 182-83.) She handles stress and changes in routine "fairly" well.  (Id. at 183.)

Plaintiff's earnings report covered the years from 1985 through 2008, inclusive.  (Id. at 141.)  She had no earnings in 1990, 1994, 1997, and 1999 through 2008, inclusive.  (Id.) Her highest annual earnings were $2,950.52, in 1993.  (Id.)  Her next highest were $1,791.37, in 1998.  (Id.)

The medical records before the ALJ are summarized below in chronological order.

On February 15, 2006, Plaintiff consulted Albert Marchiando, M.D., about her hoarseness.  (Id. at 205-06.)  She explained that she had had problems off and on for the past four years with her vocal cords feeling stressed and her throat feeling heavy.  (Id. at 206.) She had difficulties swallowing most grains and had to drink a lot of fluids at meals.  (Id.) She was able to swallow pills and meats.  (Id.)  Her weight was 250 pounds.  (Id.)  Dr. Marchiando noted that she had lost twenty pounds when pregnant in 2005.  (Id.)  For the past month, she felt like something was caught in her throat and was spitting out "large clumps of yellow mucus."  (Id.)

Following Plaintiff's June 26 visit, Dr. Marchiando noted that Plaintiff "continues to have difficulty with throat pain and hoarseness."  (Id. at 201-04.)  She had essentially normal hearing in both ears "despite rather marked tympanosclerosis and atrophy in both tympanic

membranes." (Id. at 201-02.)  An endoscopy revealed a cyst in her right vocal fold.  (Id. at 201.)  The cyst was unchanged although Plaintiff was smoking only five cigarettes a day. (Id.)  Dr. Marchiando offered to remove the cyst; Plaintiff declined.  (Id.)  She continued to take Zantac for her gastroesophageal reflux disease (GERD).  (Id.)

On March 20, 2008, Plaintiff had an cardiology consultation, including an echocardiogram (EKG).  (Id. at 226-29.)  She reported complaints of severe indigestion, fatigue, leg swelling, and chest pains.  (Id. at 228.)  She had noticed slight swelling in her lower extremities during the past six months.  (Id.)  Both her parents had coronary artery disease.  (Id.)  She had risk factors for the disease, including diabetes mellitus, hyperlipidemia, smoking abuse, and obesity.  (Id.)  After a review of her systems and an examination, the cardiologist, Robert B. Lehman, M.D., described Plaintiff as morbidly obese; she weighed 275.5 pounds.  (Id. at 229.)  She had a regular heart rate and rhythm, had a full range of motion, and had a normal mood and affect.  (Id.)  The EKG showed no acute change, but did reveal normal biventricular size and contractibility with estimated LVEP (left ventricular end diastolic pressure) of 60%; mild left atrial enlargement; normal right atrial dimension; grossly normal appearing aortic, mitral and tricuspid valves; no significant valvulopathy; and impaired left ventricular relaxation.  (Id. at 226-27.)  Dr. Lehman recommended an echo Doppler and a thallium stress test.  (Id.)  He also recommended "[a]ggressive risk factor modification" and no cigarette smoking.  (Id.)  With her risk factors, he opined that coronary artery disease should be ruled out.  (Id. at 229.)

Four days later, Dr. Lehman performed a treadmill stress test; after three minutes, Plaintiff developed symptoms of severe shortness of breath and leg and hip pain. (Id. at 224.) Myocardial perfusion imaging resulted in an impression of subtle inferior ischemia and probable breast artifact anteriorly. (Id.)

Dr. Vargas reviewed the EKG on April 10. (Id. at 225.) Plaintiff's weight was 278 pounds. (Id.) Noting that the stress test had lasted only three minutes, Dr. Vargas recommended coronary angiography. (Id.)

On April 14, Dr. Lehman performed a cardiac catheterization to investigate Plaintiff's complaints of indigestion, fatigue, leg swelling, and intermittent chest discomfort. (Id. at 222-23.) Also, she had neck pain. (Id. at 223.) The catheterization revealed decreased perfusion at the anterior wall at stress and rest, a "subtle reversible ischemia" at a portion of the interior wall, and subtle interobasal hypokinesis. (Id.) Because of Plaintiff's risk factors – obesity, smoking, and a family history of coronary artery disease – a coronary angiography was recommended. (Id.)

Plaintiff reported to Barbara Dixon-Scott, M.D., Ph.D., on May 16 that she had been having the same problems – gastritis and esophagitis – for the past ten years. (Id. at 230.) On examination, she was alert and oriented and in no apparent distress. (Id.) Subsequently, blood tests and an ultrasound of Plaintiff's gallbladder and liver were performed to investigate her complaints of abdominal pain. (Id. at 231-32, 235, 241.) The results were unremarkable. (Id.) In June, an endoscopy of Plaintiff's upper gastrointestinal tract revealed

"La Grade B reflux esophagitis"[7] and a small hiatus hernia.  (Id. at 237, 242-44.)  In August, a computed tomography (CT) scan of her abdomen and pelvis was performed to investigate her complaints of left upper quadrant pain.  (Id. at 233-34.)  Again, the results were unremarkable.  (Id. at 233.)  A colonoscopy revealed "[i]nternal, non-bleeding, moderate hemorrhoids" and "[a] few small-mouthed diverticula" in the sigmoid colon.  (Id. at 236, 238-40.)

The ALJ also had before him the reports of a consultative examination and an assessment by a non-examining, non-medical consultant.

Pursuant to her application, Plaintiff was evaluated by Arthur P. Greenberg, M.D., on July 26, 2006.  (Id. at 209-15.)  He summarized her current medical illnesses as follows.

> [C]omplaints of arthralgia and myalgia with fatigue reportedly diagnosed as fibromyalgia in past and now thought to be dystonia according to [Plaintiff] which is manifest by muscular fasciculations and paresthesias being treated with neurontin, a history of seizure disorder of grand mal type with seizures with post ictal amnesia reportedly occurring up to 3 times per week that are being treated with Tegretol with [Plaintiff] reporting that she has seizures during her sleep with tongue biting, diabetes mellitus being treated with insulin, back pain and paresthesias reportedly exacerbated by extended bending and walking reportedly related to degenerative disk disease for which she is not taking any specific treatment, asthma and seasonal allergies being treated with Zytec and Flonase, GERD and gastritis being treated with Zantac, depression being treated with [sic], and Paget's Disease with reported ankle pain due to periodic "dislocation of ankles."

(Id. at 209-10.)  On examination, she ambulated with a normal gait, did not need an assistive device, and was comfortable in both a sitting and standing position.  (Id. at 210.)  Her body

---

[7]LA Grade B esophagitis is defined as having "[a]t least one mucosal break more than 5 mm long, none of which extends between the tops of the mucosal folds."  What is GERD?  What Causes GERD?, http://www.medicalnewstoday.com/articles/14085.php (last visited Sept. 21, 2020).

mass index (BMI) was 45.  (Id.)  Intellectual functioning seemed normal.  (Id.)  She had no distinct tender points during the exam.  (Id.)  She did have a persistent fine tremor in her right hand throughout the exam.  (Id.)  She was able to hear and understand voices without difficulty.  (Id. at 211.)  Her upper extremity joints had no pain with movement, edema, laxity, redness, or tenderness.  (Id.)  Her range of motion was normal.  (Id.)  She was able to make a fist bilaterally, was able to pick up coins with both hands, and had no atrophy in her hands.  (Id.)  Her lower extremities had no edema, laxity, redness, tenderness, or pain with movement.  (Id.)  Her range of motion was normal except for decreased outward rotation of her left ankle.  (Id.)  Straight leg raising was normal.[8]  (Id.)  "Touch, pin prick, and vibratory sensations [were] normal on right and decreased on left in both upper and lower extremities."  (Id. at 212.)  There was no atrophy, and she could walk on her heels, stand on her left leg but not her right, and had good coordination.  (Id.)  She was not able to squat due to her reported knee pain or able to walk on her toes due to reported right foot pain.  (Id.)  She could get on and off the exam table with no significant difficulty, but her "movements were somewhat slow and painful throughout the exam."  (Id.)

Dr. Greenberg's impression was of obesity; fibromyalgia by history; dystonia by history; degenerative changes in spine by history; tremor in right hand, etiology uncertain;

---

[8]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended."  **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

GERD/Gastritis by history; depression by history; asthma by history; Paget's disease; seizure disorder by history; and diabetes mellitus by history. (<u>Id.</u>)

The following month, a Physical Residual Functional Capacity Assessment (PRFCA) was completed as part of the SSI review process. (<u>Id.</u> at 216-21.) The primary diagnosis was neuropathy; the secondary diagnosis was diabetes; and other impairments included asthma, Paget's disease,[9] and fibromyalgia. (<u>Id.</u> at 216.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and stand, walk, or sit about six hours in an eight-hour day. (<u>Id.</u> at 217.) Her ability to push or pull was unlimited other than these lifting and carrying restrictions. (<u>Id.</u>) She had postural limitations of frequently climbing, stooping, kneeling, crouching, and crawling and never balancing. (<u>Id.</u> at 219.) She had no manipulative, visual, or communicative limitations. (<u>Id.</u> at 219-20.) She had environmental limitations of needing to avoid hazards. (<u>Id.</u> at 220.)

## <u>The ALJ's Decision</u>

Following the Commissioner's five-step evaluation process in order, see pages 18 to 21, below, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity at any relevant time, noting that she had never earned more than $3,000.00 in any year. (<u>Id.</u> at 88.) At step two, the ALJ found that Plaintiff had severe impairments of diabetes mellitus, diabetic and other peripheral neuropathy, fibromyalgia, degenerative disc

---

[9]The reviewer incorrectly spelled the disease as "pageants."

disease, Paget's disease, and obesity.  (Id.)  He found at step three that these impairments,
singly or in combination, did not meet or equal an impairment of listing-level severity.  (Id.)

The ALJ then reached the question of Plaintiff's residual functional capacity (RFC).
(Id. at 88-93.)  He found that she had the RFC to occasionally lift and carry twenty pounds,
frequently lift and carry ten pounds, sit six hours in an eight-hour workday, and stand/walk
two hours in an eight-hour workday.  (Id. at 88.)  She needed to avoid concentrated exposure
to extreme cold, wetness, fumes, odors, dusts, and gases.  (Id.)  She did not have any
manipulative limitations, although she did have a fine tremor in her right hand.  (Id. at 88-
89.)  She did not have any limitations caused by a mental impairment.  (Id. at 89.)

When assessing Plaintiff's RFC, the ALJ considered Plaintiff's testimony, but found
that, based on the evidence of record, her medically determinable impairments could
reasonably be expected to produce some of her alleged symptoms, but not of the intensity,
duration, and limiting effects described by Plaintiff.  (Id. at 89-90.)  For instance, Plaintiff
alleged an onset date in 1998 but did not produce any records prior to February 2006.  (Id.
at 90.)  Dr. Marchiando's June 2006 records related to complaints of throat pain and
hoarseness.  (Id.)  An audiogram revealed essentially normal hearing.  (Id.)  Plaintiff elected
not to have a lesion removed in her right true vocal fold.  (Id.)  Additionally, the evaluation
of Dr. Greenberg and the records of the cardiac catherization and of Dr. Dixon were well
supported and entitled to substantial weight, unlike the PRFCA completed by a non-medical
source.  (Id. at 90-91.)  The ALJ also noted Plaintiff's "relatively limited history of medical
treatment"; the presence of "significant gaps" in that history; the lack of surgery, physical

therapy, chiropractic treatments, treatment at a pain clinic, use of a transcutaneous electrical nerve stimulation (TENS) unit for pain relief, emergency room treatment, hospitalizations, or injections for pain relief; and the absence of any opinions from treating or examining physicians indicating that Plaintiff is disabled or has greater limitations than those included in the RFC. (Id. at 91-92.) Also detracting from Plaintiff's credibility was her use of medications, the absence of any complaints to her physicians of persistent side effects, her poor work history, and her "generally unpersuasive appearance and demeanor while testifying at the hearing." (Id. at 92.) Specifically, she "had no apparent difficulty understanding or responding to the questions posed to her." (Id.)

Proceeding to step four, the ALJ determined that Plaintiff had no past relevant work. (Id. at 93.) Considering her age, education, and RFC, the ALJ found at step five that Plaintiff could perform the representative occupations described by the VE, e.g., phone surveyor and credit checker. (Id. at 93-94.) Plaintiff was not, therefore, disabled within the meaning of the Act.

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other

kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 416.920(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 416.920(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 416.920(d), and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Wagner**, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The

credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 416.920(e).

The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 416.920(f). The Commissioner may meet his burden by eliciting testimony by a VE in response to "a properly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997). "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams v.**

**Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)).  Accord **Goff v. Barnhart**, 421 F.3d 785, 794 (8th Cir. 2005); **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999).  Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question.  **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001).  Cf. **Swope v. Barnhart**, 436 F.3d 1023, 1025 (8th Cir. 2006) (remanding for further proceedings case in which ALJ did not include undisputed, severe impairment in hypothetical question to VE).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'"  **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001).  "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'"  **Wiese**, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999).  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might

have "come to a different conclusion," **Wiese**, 552 F.3d at 730.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000).  See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole because he improperly (1) assessed her RFC, including by not appropriately considering her obesity and other impairments; (2) evaluated her credibility; and (3) relied on the VE's testimony, which was flawed because it was premised on an incomplete hypothetical and on inaccurate information.

Plaintiff first contends that the ALJ's RFC assessment is fatally flawed because it does not reflect Dr. Greenberg's findings of extreme obesity, decreased outer rotation in her left ankle, an inability to walk on her toes, her slow and painful movement, the decreased sensation in her left upper and lower extremities, her sluggish tendon reflexes, and her right hand tremor.

"Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." **Cox v. Astrue**, 495 F.3d 614, 620 (8th Cir. 2007).  As explained below, the ALJ's assessment of Plaintiff's RFC is supported by substantial evidence on the record as a whole.

Plaintiff correctly notes that her BMI of 45 is considered Level III extreme obesity under the guidelines of the National Institutes of Health. See Titles II and XVI: Evaluation of Obesity, S.S.R. 02-1p, 2000 WL 628049, *2 (S.S.A. Sept. 12, 2002). When considering a claimant's obesity, an ALJ is to consider whether it is a "severe" impairment. Id. at *4. It is such an impairment "when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." Id. "There is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment[,]" nor does the descriptive term, e.g., "extreme," establish whether the obesity is severe. Id. The ALJ found Plaintiff's obesity to be a severe impairment.

The next question then before the ALJ was whether her obesity met or equaled a listing. Id. at *5. "Because there is no listing for obesity, [the ALJ] will find that an individual 'meets' the requirements of a listing if . . . she has another impairment that, by itself, meets the requirements of a listing . . . [or] if there is an impairment that, in combination with obesity, meets the requirements of a listing." Id. Plaintiff argues that her obesity in combination with her difficulties walking meets the requirements of Listing 1.02A. That listing, for "[m]ajor dysfunction of a joint(s) (due to any cause)," requires "[i]nvolvement of one major peripheral weight bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively as defined in 1.00B2b." 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 1.01. "To ambulate effectively" is to "be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." Id. § 1.00B2b. There was evidence that Plaintiff had

a decreased outward rotation in her left ankle, was not able to walk on her toes without pain, had slow and painful movements, and had to stop after three minutes on a treadmill due to leg and hip pain.[10] On the other hand, there was also evidence that she walked with a normal gait, did not need an assistive device, had, with the exception of the left ankle, a normal range of motion, had no atrophy, could walk on her heels, and could get off and on an examination table with no significant difficulty.

The ALJ's RFC included no manipulative limitations,[11] which Plaintiff argues is error. At the consultative examination, however, Plaintiff had a normal range of motion in her upper extremities, was able to make a fist bilaterally, could pick up coins with both hands, and had no atrophy in her hands.

Thus, contrary to Plaintiff's argument, the ALJ's RFC was supported by medical evidence.[12] The limitations that were not included in the RFC were those which relied on her

---

[10]Plaintiff described a limited ability to walk without having to rest. Her credibility will be addressed below.

[11]The ALJ did acknowledge that Plaintiff had a tremor in her right hand.

[12]Plaintiff also argues that the ALJ erred by not sending her for further testing as suggested by Dr. Greenberg. In his report, Dr. Greenberg noted that the tremor in Plaintiff's right hand was suggestive of neuropathy, but "further testing and recent medical records are required for definitive evaluation." (R. at 212.) The ALJ found, however, that the tremor did not adversely affect Plaintiff's manipulative abilities. An ALJ does not fail in his or her duty to fully and fairly develop the record when there is no crucial issue undeveloped. See **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010). Moreover, Plaintiff's failure to follow through on the suggested tests may be considered to be a detraction from Plaintiff's credibility. See **Tate v. Apfel**, 167 F.3d 1191, 1197 (8th Cir. 1999) (affirming adverse decision in case in which ALJ commented on claimant's failure to follow advice of consulting examining physician "to pursue suggested tests to better evaluate the nature of his seizures").

credibility. Plaintiff contends, however, that the ALJ also erred in assessing her credibility. He did not.

It is uncontested that Plaintiff has severe impairments of diabetes mellitus, diabetic and other peripheral neuropathy, fibromyalgia, degenerative disc disease, Paget's disease, and obesity. The dispute is whether her impairments prevent her from engaging in substantial gainful activity. If Plaintiff were found to be credible, she would be found to be disabled.

As noted above, an ALJ must evaluate a claimant's credibility when determining her RFC. **Wagner**, 499 F.3d at 851, **Dukes**, 436 F.3d at 928. When evaluating Plaintiff's credibility, the ALJ noted the lack of any objective medical evidence to support her description of the extensive affect her impairments have on her ability to function. The lack of supporting objective medical evidence is a well-established consideration in the evaluation of a claimant's credibility. See **Moore**, 572 F.3d at 524; **Finch**, 547 F.3d at 936; **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008). Although "'[a]n ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,'" **Medhaug v. Astrue**, 578 F.3d 805, 816 (8th Cir. 2009) (quoting Goff, 421 F.3d at 792), there are other inconsistencies supporting the ALJ's adverse credibility finding. For instance, the lack of any restriction placed on her by her physicians detracts from her credibility. See **Mouser**, 545 F.3d at 638; **Roberson v. Astrue**, 481 F.3d 1020, 1025 (8th Cir. 2007); **Raney v. Barnhart**, 396 F.3d 1007, 1011 (8th Cir. 2005). The ALJ also noted Plaintiff's limited history of medical treatment. Indeed, although she alleged a disability onset date in December 1998, her medical records did not begin until February 2006 when she saw

- 25 -

treatment for complaints not now at issue.  See **Shannon v. Chater**, 54 F.3d 484, 486 (8th Cir. 1995) ("While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem.").  Moreover, once Plaintiff did seek medical treatment for her allegedly debilitating impairments, that treatment was minimal.  See **Gonzales v. Barnhart**, 465 F.3d 890, 895 (8th Cir. 2006) (affirming ALJ's adverse credibility findings based on, inter alia, lack of aggressive medical treatment); **Tate**, 167 F.3d at 1197 (affirming ALJ's adverse credibility findings when claimant had not pursued emergency "or other forms of treatment to the degree that one would expect if his claims of severe pain were actually valid").

The ALJ also correctly considered Plaintiff's poor work record as detracting from her credibility.  A consistent work record supports a claimant's credibility, see **Hutsell v. Massanari**, 259 F.3d 707, 713 (8th Cir. 2001); conversely, an inconsistent work history does not, see **Frederickson v. Barnhart**, 359 F.3d 972, 976 (8th Cir. 2004); **Ramirez**, 292 F.3d at 581.  See also **Juszczyk v. Astrue**, 542 F.3d 626, 632 (8th Cir. 2008) (affirming ALJ's adverse credibility decision based in part on claimant's poor work history, including an absence of earnings at a level indicating substantial gainful activity even when not allegedly disabled).

In explaining his credibility findings, the ALJ noted his observations of Plaintiff's attention and demeanor at the hearing.  Contrary to Plaintiff's argument, this too is a proper consideration.  See **Johnson**, 240 F.3d at 1147-48.

In her final argument, Plaintiff challenges the ALJ's reliance on the VE's testimony on the grounds that the VE's citation to a telephone solicitor, or telephone surveyor, job is error because the VE characterized the job as part-time and skilled.[13]

Given the context of the VE's reference to "part-time,"[14] the Court agrees with the Commissioner that the VE was not qualifying the telephone solicitor job as part-time, nor were the numbers cited restricted to part-time positions.[15]

Further, the VE described the job as semi-skilled, not skilled, and as requiring no more than a week of training. This training demand corresponds to unskilled work. See note 5, supra. "Although the DOT generally controls, '[t]he DOT classifications may be rebutted . . . with VE testimony which shows that 'particular jobs, whether classified as light or sedentary, may be ones that a claimant can perform.'" **Young v. Apfel**, 221 F.3d 1065, 1070 (8th Cir. 2000) (quoting Montgomery v. Chater, 69 F.3d 273, 276 (8th Cir.1995)) (alterations in original). The VE testified that there were jobs existing in significant numbers in the Missouri

---

[13]Plaintiff also argues that the hypothetical posed the VE was flawed because it included an unsupported RFC. This argument is meritless for the reasons set forth above in the RFC discussion.

[14]After describing the job of telephone solicitor, the VE was asked by the ALJ "how may jobs?" (R. at 40.) He replied:
> Your Honor, I'm sure that's in another book. Here just a second. Your Honor, they attend [sic], again, to do part-time on that. Just a second. I get too organized, Your Honor, with too many books. Your Honor, it shows in the whole State of Missouri 1400 . . . .

(Id.)

[15]And, as noted by the Commissioner, the VE testified that Plaintiff could perform the job of credit checker in addition to the challenged job. Thus, whatever the failings of the reference to the job of telephone solicitor might be, they had no bearing on the outcome. See **Hepp v. Astrue**, 511 F.3d 798, 806 (8th Cir. 2008) (declining to remand for alleged error in opinion when error "had no bearing on the outcome") (internal quotations omitted).

and national economies that Plaintiff could perform. Where, as here, the VE testified based on a properly-phrased hypothetical, that testimony constitutes substantial evidence. **Page v. Astrue**, 484 F.3d 1040, 1045 (8th Cir. 2007).

### Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  23rd  day of September, 2010.